[No. 55874-4. En Banc. October 31, 1989.]

THE STATE OF WASHINGTON, *Respondent,* v. PETER M. CARVER, *Appellant.*

*Julie A. Kesler* and *Patricia Novotny* of *Washington Appellate Defender Association*, for appellant.

*Seth R. Dawson, Prosecuting Attorney*, and *Seth Aaron Fine, Deputy*, for respondent.

UTTER, J.—Appellant Peter Carver challenges the constitutionality of the custodial interference statute, RCW 9A.40.060, and maintains that the trial court did not have sufficient evidence of guilt to support a conviction for that offense. Mr. Carver appealed to the Court of Appeals, which certified the case to this court.

Peter and Tamra Carver married in Warm Beach, Washington in April 1981. On July 11, 1982, Tamra gave birth to their child, Bethanie Ann, in Everett. During their marriage, the Carvers moved frequently, generally living in Washington but staying in California for short periods as well.

The marriage proved to be unstable, with occasional separations. Early in 1986, Mr. Carver and Bethanie moved to California, where Peter began dissolution proceedings in January of that year. Temporary court orders in California gave Peter custody of Bethanie. Mr. Carver testified that until March 1986, Tamra was living with her boyfriend in Washington. Soon afterward, Ms. Carver came to California to respond to dissolution proceedings. These proceedings were continued to allow Ms. Carver to obtain counsel. After the initial hearing, there appeared to be a reconciliation of sorts. Mr. Carver however, claims that reconciliation never occurred in a legal sense; he maintains that he intended the dissolution proceedings to continue. Apparently, no order of conciliation was made.

The Carvers returned to Washington in the middle of June or July of 1986. During the month of October, Mr. Carver began to tell Tamra that he intended to take Bethanie to California with him. Tamra alleged that Mr. Carver exhibited a "violent temper" during this time. According to Tamra, however, Mr. Carver did not physically strike her. On November 7, 1986, Tamra obtained a protective order from Snohomish County Superior Court. This order restrained Mr. Carver from entering Tamra's residence and from "interfering with petitioner's [Tamra's] custody" of Bethanie. Tamra and Bethanie moved out of the house where the family was living and into the Stop Abuse Shelter in Everett. At his eventual trial for custodial interference, Mr. Carver asserted that the Superior Court had no notice of the California proceedings awarding him temporary custody. A second protective order was issued on November 17.

Mr. Carver returned to California by himself and continued dissolution proceedings. The Superior Court for Los Angeles County granted the Carvers a dissolution of marriage on December 22, 1986. The decree was entered in default as Ms. Carver was not present, the order of default made on December 11. The record indicates that Ms. Carver did not receive adequate notice of the dissolution

proceedings—the papers were sent to an old address and she never received them. The California dissolution decree gave Mr. Carver permanent custody of Bethanie.

During this same time, on December 11, Ms. Carver filed for dissolution of their marriage in Snohomish County Superior Court, also seeking custody of Bethanie. She also obtained an order requiring Mr. Carver to show cause why she should not have custody. Apparently, she was unable to obtain proper process on Mr. Carver.

On December 24, 1986, Mr. Carver appeared in the Snohomish County Superior Court in response to the dissolution filed by his wife. Apparently she was not present. The court enjoined both parties from removing Bethanie from Washington. Ms. Carver was given temporary custody of Bethanie by Superior Court Commissioner Bedle. During this hearing, Mr. Carver advised the Commissioner of the existence of the California dissolution decree and custody order and filed a motion for writ of habeas corpus to obtain custody of his daughter. He requested a show cause hearing and that the Superior Court enforce the California order.

On December 30, 1986, an alias hearing was held before Commissioner Bedle on the December 11 show cause order. The Commissioner found that Washington had jurisdiction over Bethanie. He treated the petition for dissolution as a modification (of the California decree) and "request for paternity." He again enjoined the parents from taking Bethanie out of state and again granted temporary custody of Bethanie to Ms. Carver with visitation rights to Mr. Carver. The Commissioner made this order to preserve the status quo: that is, the temporary custody decree contained in the restraining orders issued in November. The case was continued pending receipt of California records.

Peter Carver contacted his attorney in California, Evan Ginsburg. On the basis of what Peter told him, Mr. Ginsburg advised him that his California custody order was the only valid one. The Washington courts, so Peter alleges he was told, did not have the power to modify the California decree.

On January 20, 1987, Mr. Carver obtained permission from Tamra to visit Bethanie. Instead of returning with her at the arranged time, Mr. Carver took Bethanie to California. Between January and July 1987, Bethanie remained in California with Mr. Carver. He alleges that during this time he encouraged Tamra to contact Bethanie. This encouragement took the form of a letter sent by Mr. Carver's mother, Patricia Leicester (with whom he and Bethanie were apparently living), to Tamra's lawyer in Everett, Russ Juckett. The letter explained how Tamra could call Bethanie and encouraged her to call collect. The letter also said that Mr. Carver would pay for airfare if Tamra wanted to visit. Mr. Juckett had no memory of receiving this letter, although an affidavit of mailing accompanies the letter in the exhibit.

Meanwhile, in Washington, Ms. Carver got in touch with the police. The Snohomish County prosecutor filed, and then dismissed, charges against Peter Carver. Later, however, the prosecutor refiled the charges.

Ms. Carver later went to California and obtained a writ of habeas corpus to gain custody of Bethanie. Mr. Carver appeared at these proceedings through an attorney. Mr. Carver was arrested for custodial interference and Bethanie was returned to Tamra by the California authorities.

At his trial for custodial interference in Snohomish County, Mr. Carver argued that his behavior did not fit the definition of the offense in that he did not intend to deprive Tamra of lawful custody. He introduced evidence that he provided Ms. Carver with access to Bethanie, such as the letter from his mother. His main contention, however, was that Ms. Carver's custody was not lawful to begin with, as it contravened the permanent custody order from the Los Angeles County Superior Court. Therefore, his actions may have been in contempt of the Snohomish County court orders, but did not constitute the offense of custodial interference. The trial court found Mr. Carver

guilty of custodial interference in the first degree.[1] Peter appealed to the Court of Appeals, arguing that the custodial interference statute was unconstitutional on its face or as applied to him. He also reiterated his defense theories at trial. The Court of Appeals certified the matter to this court.

I

Appellant asserts that the custodial interference statute is unconstitutional on its face under U.S. Const. amend. 14 and Const. art. 1, § 3—that it is void for vagueness. That statute, RCW 9A.40.060, reads in relevant part:

(1) A relative of a child under the age of eighteen or of an incompetent person is guilty of custodial interference in the first degree if, with the intent to deny access to the child or incompetent person by a parent, guardian, institution, agency, or other person having a lawful right to physical custody of such person, the relative takes, entices, retains, detains, or conceals the child or incompetent person from a parent, guardian, institution, agency, or other person having a lawful right to physical custody of such person and:

(a) Intends to hold the child or incompetent person permanently or for a protracted period; or

(b) Exposes the child or incompetent person to a substantial risk of illness or physical injury; or

(c) Causes the child or incompetent person to be removed from the state of usual residence; or

(d) Retains, detains, or conceals the child or incompetent person in another state after expiration of any authorized visitation period with intent to intimidate or harass a parent, guardian, institution, agency, or other person having lawful right to physical custody or to prevent a parent, guardian, institution, agency, or other person with lawful right to physical custody from regaining custody.

In both his facial and as–applied constitutional arguments, Mr. Carver points to two requirements for criminal statutes that he alleges RCW 9A.40.060 fails to provide. The statute must define the offense (1) with enough definiteness so that a person of ordinary intelligence can understand what conduct is prohibited; and (2) in such a

---

[1]The trial judge found that both the California and Washington custody decrees were valid but voidable. Report of Proceedings, at 294–96.

way that does not encourage arbitrary or discriminatory enforcement. *See Papachristou v. Jacksonville,* 405 U.S. 156, 31 L. Ed. 2d 110, 92 S. Ct. 839 (1972); *State v. Hilt,* 99 Wn.2d 452, 454, 662 P.2d 52 (1983); *Bellevue v. Miller,* 85 Wn.2d 539, 543–44, 536 P.2d 603 (1975). Mr. Carver argues that the term "lawful right to physical custody" in the statute is so vague that it does not meet either of these two requirements.

Specific to his facial challenge, Mr. Carver argues that the statute affects a fundamental constitutional right: a parent's custody of his or her child. *See Santosky v. Kramer,* 455 U.S. 745, 71 L. Ed. 2d 599, 102 S. Ct. 1388 (1982); *State v. LaCaze,* 95 Wn.2d 760, 763, 630 P.2d 436 (1981). Because of this, he maintains, the statute is unconstitutional regardless of the facts of his own case. For support for this argument, he analogizes to the First Amendment overbreadth doctrine and cites *NAACP v. Button,* 371 U.S. 415, 432, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963).

Appellant's argument continues with a citation to numerous cases in which this court has found the term "lawful" in different contexts to be unconstitutionally vague. *See State v. Richmond,* 102 Wn.2d 242, 683 P.2d 1093 (1984) ("without lawful excuse" in criminal nonsupport statute); *State v. Hilt, supra* ("without lawful excuse" in bail jumping statute); *State v. White,* 97 Wn.2d 92, 640 P.2d 1061 (1982) ("without lawful excuse" in stop and identify statute); *Seattle v. Rice,* 93 Wn.2d 728, 612 P.2d 792 (1980) ("lawful order" in trespass ordinance); *but see State v. Smith,* 111 Wn.2d 1, 759 P.2d 372 (1988); *State v. Aver,* 109 Wn.2d 303, 745 P.2d 479 (1987); *State v. Miller,* 103 Wn.2d 792, 698 P.2d 554 (1985).

■ Although appellant invokes the protection of the Washington constitution, he does not present any arguments why its protection in this instance may be greater than that of its federal counterpart. Nor does he address the nonexclusive interpretive criteria that this court developed for state constitutional interpretation in *State v.*

*Gunwall,* 106 Wn.2d 54, 720 P.2d 808 (1986). In the absence of developed briefing and argument addressing these concerns, this court will analyze only the federal constitutional issues involved in the case. *State v. Worrell,* 111 Wn.2d 537, 539 n.1, 761 P.2d 56 (1988); *State v. Wethered,* 110 Wn.2d 466, 472, 755 P.2d 797 (1988). Therefore, we will analyze his claims under the federal provisions only.

Unless First Amendment freedoms are involved, this court generally will only determine whether a statute is unconstitutional as applied to the facts of the case. *State v. Worrell, supra* at 541; *see also United States v. Mazurie,* 419 U.S. 544, 550, 42 L. Ed. 2d 706, 95 S. Ct. 710 (1975). Under this analysis, Mr. Carver's facial challenge must fail—he does not allege that his claimed right involves First Amendment freedoms.[2]

In recent cases, a majority of this court has consistently held that the term "lawful" in criminal statutes is not inherently vague. *See State v. Smith, supra; State v. Worrell, supra; State v. Aver, supra.* Through the focus given to it by recent precedent, then, this language does not

---

[2]As discussed in the concurring opinion in *State v. Worrell, supra,* more recent United States Supreme Court precedent does not appear to limit facial challenges strictly to the First Amendment area. *See, e.g., Kolender v. Lawson,* 461 U.S. 352, 358 n.8, 75 L. Ed. 2d 903, 103 S. Ct. 1855 (1983); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, 71 L. Ed. 2d 362, 102 S. Ct. 1186, *reh'g denied,* 456 U.S. 950 (1982). *Worrell,* at 545–47 (Utter, J., concurring). The pattern of authority these cases develop would allow consideration of a facial challenge if:

> (1) the statute criminalizes behavior that would not normally be considered criminal with no requirement of mens rea; (2) the statute invites an inordinate amount of police discretion, to the point of allowing police to selectively enforce the statute at their "whim"; or (3) the statute's vagueness is truly egregious.

(Citations omitted.) *Worrell,* at 547 (Utter, J., concurring). Under this analysis, Mr. Carver's argument fails as well. The behavior that the custodial interference statute criminalizes—one relative's removing a child from the lawful custody of another—would not necessarily be considered noncriminal were it not for the mental element of intent. Under some conditions, the behavior in question could fall under the definition of kidnapping or unlawful imprisonment. *Cf. State v. LaCaze,* 95 Wn.2d 760, 630 P.2d 436 (1981) (unless parent has lost right to custody of children, cannot be convicted of second degree kidnapping). In addition, the statute neither allows excess police discretion nor is egregiously vague.

necessarily invite arbitrary or discriminatory enforcement, nor could any vagueness be truly egregious.

Moreover, the "chill" analysis of First Amendment overbreadth doctrine is inappropriate here. The statute, taken on its face, does not aim to chill one's right to custody of children. Rather, it seeks to proscribe the act of denying another person custody who normally would have it. Consequently, the statute actually protects a person's right to custody. In so doing, the statute encourages more constructive methods of resolving custody disputes such as agreement, mediation, and adjudication.

## II

Appellant focuses most of his constitutional argument on the statute's effect as applied to the facts of this case. He asserts that an ordinary citizen does not have adequate notice of the conduct prohibited by the custodial interference statute when each spouse allegedly has a "lawful" custody order from different states. In such a situation, apparently, the meaning of "lawful" is not "readily ascertainable"—either as defined in the statute or under well established common law principles. *See State v. Smith, supra* at 7–8, 11. Therefore, he claims, it cannot pass constitutional muster.

Mr. Carver also argues that the statute is overbroad in his case in that it is susceptible to "sweeping and improper application" to "a substantial amount of protected conduct." *See State v. Smith, supra.* He alleges that his right to custody was fully protected by the California court orders. He analogizes his situation to that in *State v. LaCaze,* 95 Wn.2d at 763 (parent who takes children out of state, where there was no evidence that he did not have the right to custody, is not guilty of kidnapping). Because the statute here criminalizes what Mr. Carver asserts is proper conduct, it offends due process.

Mr. Carver stresses that he acted partially on the advice of his California attorney, Mr. Ginsburg. His understanding

therefore was that only the California decree was valid and he was the only parent entitled to lawful custody.

Under this court's holding in *State v. Smith, supra,* the statutory term "lawful" will not be considered unconstitutionally vague if its meaning is clarified by "readily ascertainable sources of law". *Smith,* at 11. The State argues that readily ascertainable law exists which illuminates the meaning of "lawful custody." As a starting point, both parents share a lawful right to custody of their children absent court orders to the contrary. *LaCaze,* at 763; *In re Schreifels,* 47 Wn.2d 409, 414, 287 P.2d 1001 (1955). Any changes in this norm of custody are spelled out by statute. *See, e.g.,* RCW 26.09.200 (temporary custody orders);[3] RCW 26.10.040 (award of custody to nonparent); RCW 13.34.130 (dependency proceedings). In a situation involving multiple states, the law is governed by the Uniform Child Custody Jurisdiction Act (UCCJA), codified at RCW 26.27, and the federal Parental Kidnapping Prevention Act (PKPA), 28 U.S.C. § 1738A.

Mr. Carver maintains that statutes such as the UCCJA and PKPA are too complex for the person of average intelligence to interpret. He argues that if notice of the meaning of "lawful custody" in his situation turns on these statutes, then the operation is unconstitutionally vague. The complexity and uncertainty surrounding these statutes is illustrated, Mr. Carver implies, by the fact that his California attorney advised him that the California custody decree was still valid while the Snohomish County Superior Court Commissioner reached the opposite conclusion.

The meaning of "lawful custody" was not as mysterious as Mr. Carver insists. Whether ultimately correct or not, the Commissioner of the Snohomish County Superior Court ruled on December 30, 1986, that, pending receipt of documents from the California proceedings, Tamra was to

---

[3]The Legislature repealed RCW 26.09.200 in 1987. *See* Laws of 1987, ch. 460, § 61(3). New statutes, RCW 26.09.181–.210, which mandate the creation of parenting plans, now govern custody matters.

have custody of Bethanie. This ruling should have provided more than enough notice to Mr. Carver that, as far as the Washington courts were concerned, Tamra had lawful custody of Bethanie, not he. The ruling would also carry more weight than the advice of an attorney. Mr. Carver had legal channels through which he could contest the correctness of the Commissioner's ruling, thus resolving any ambiguities between his attorney's advice and the Commissioner's ruling. He chose to forgo these channels. Therefore, for the purpose of informing him of the meaning of "lawful custody" in this situation, the Commissioner's ruling modifying the California custody decree resolves any constitutional ambiguities in the custodial interference statute. Further, this ruling provided sufficient guidance to law enforcement personnel regarding who had lawful custody of the child.

Mr. Carver argues that the statute would criminalize both parents' right to custody in a situation such as this: where each parent has custody according to a decree from a different state. He suggests that the prosecutor's decision to bring charges against him, rather than, Ms. Carver, smacked of regional favoritism.

This argument, like the one above, could only be tenable if one disregarded the impact of the Commissioner's orders. For constitutional purposes, Mr. Carver was put on notice that the Washington courts considered custody to be with Ms. Carver, not with him. Further, as Mr. Carver himself later argues, under the UCCJA and PKPA, only one state's custody decree could be valid at a given time. *See* RCW 26.27.140 (this State not to modify another state's custody decree unless UCCJA's jurisdictional requirements are met and other state no longer has jurisdiction); 28 U.S.C. § 1738A(f) (same). Therefore, the argument he presents here is without merit.

Mr. Carver further alleges that penalizing him for exercising his custody rights granted by one court is a violation of the full faith and credit clause. Again, this argument is based on the idea that Mr. Carver's own interpretation of

the validity of the Commissioner's ruling was correct. Whatever the ultimate correctness of the Commissioner's ruling, it facially followed the directives of the UCCJA and PKPA—statutes designed to solve full faith and credit problems with custody decrees between states.

Appellant also argues that the rule of lenity should apply in this case. Under this rule, an ambiguous criminal statute should be interpreted in the manner that most favors the defendant. *See In re Cross,* 99 Wn.2d 373, 379, 662 P.2d 828 (1983); *In re Carson,* 84 Wn.2d 969, 973, 530 P.2d 331 (1975). He argues that RCW 9A.40.060 should not be interpreted to apply "to a situation where there are multiple orders awarding custody to different people," penalizing one of them for exercising his rights. A point appellant makes in a different argument is applicable here: under the UCCJA and PKPA, multiple orders granting custody in different states cannot exist. Only one state's custody decree can actually be valid at one time.

■ The language of RCW 9A.40.060 does not explicitly address the implications of "lawful custody" in interstate custody disputes. Under the "readily ascertainable sources of law" rule, however, an explicit reference is not necessary. *See State v. Smith,* 111 Wn.2d 1, 759 P.2d 372 (1988). All that is needed is a clear form of notice to the criminal defendant what conduct is proscribed. *See Papachristou v. Jacksonville,* 405 U.S. 156, 31 L. Ed. 2d 110, 92 S. Ct. 839 (1972); *State v. Hilt,* 99 Wn.2d 452, 662 P.2d 52 (1983); *Bellevue v. Miller,* 85 Wn.2d 539, 536 P.2d 603 (1975). In Mr. Carver's case, the Commissioner's ruling provided that notice.

### III

Appellant also contends that the trial court did not have sufficient evidence to support a finding of guilt. In particular, he points to three areas where evidence was lacking.

First, Mr. Carver argues that the evidence did not show that he meant to deny access to Bethanie. Although

"access" is not defined in the statute, he submits a dictionary definition: "permission, liberty, or ability to enter, approach, communicate with, or pass to and from". *Webster's Third New International Dictionary* 11 (1981). He alleges that at no time did he intend to deny his wife the "ability, permission or liberty to approach or communicate" with their daughter. Brief of Appellant, at 35.

The trial court weighed conflicting evidence on this issue. Mr. Carver testified that he did not hide or secrete Bethanie—that Ms. Carver knew where she was and sent her cards and letters. Carver's mother testified that she sent a letter to Tamra's attorney giving specific details about how to contact Bethanie and offering to pay Tamra's airfare to California. On the other hand, Denise Schmutte—a child psychologist who had some therapy sessions with Bethanie—testified that Mr. Carver told her he did not intend to allow Tamra access to Bethanie. Ms. Schmutte stated:

> [Mr. Carver] told me that he didn't intend to carry out the promise he'd made to Bethanie earlier that day [that "she was not going to be cut off from contact from either parent"], that he felt Tami had used what he called "Auschwitz tactics" against Beth, and that therefore he didn't want her to have any contact.

Report of Proceedings, at 38.

■ The basic standard of review in determining whether the evidence supports a criminal verdict is whether "after viewing the evidence in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime *beyond a reasonable doubt*.'" *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979). Deference must be given to the trier of fact who resolves conflicting testimony and evaluates the credibility of witnesses and persuasiveness of material evidence. *Green; State v. Lawson*, 37 Wn. App. 539, 543, 681 P.2d 867 (1984). Here, the trial judge weighed the evidence before him and reached a reasonable conclusion, ostensibly based on his observation of the witnesses. It was reasonable for the judge to conclude that the

testimony of a mental health professional was persuasive. In short, one could not argue that no rational trier of fact could have reached the same conclusion.

Second, Mr. Carver alleges that no evidence was introduced showing that he intended to intimidate or harass Tamra. He argues that the court did not make proper findings of fact to support such a conclusion. While this may be true, it is of no consequence to the finding of his guilt. Intent to intimidate or harass is only an element of custodial interference under subsection (1)(d) of the statute: when the defendant retains the child in another state after expiration of an authorized visiting period. The sections of the statute relevant to Mr. Carver's activity do not contain such an element. Therefore, the trial court's conclusion in this matter, even if erroneous, is irrelevant.

Mr. Carver's main contention in his "insufficient evidence" argument is that Ms. Carver never had a "lawful right to physical custody" of Bethanie. He asserts that the Washington courts gave temporary custody of Bethanie to Tamra in violation of the UCCJA and PKPA: under these acts, two states cannot assume jurisdiction and grant custody at the same time. Because Tamra did not in fact have lawful custody, Mr. Carver argues, he did not commit the crime as charged.

Mr. Carver's argument is based on a rather confusing record of numerous court orders from different states. His version of the facts are as follows. The California court granted him temporary custody of Bethanie in March 1986 at the hearing attended by Tamra. That hearing immediately preceded their "reconciliation"—assumed by Tamra but denied by Mr. Carver. Because he never intended to abandon the dissolution proceedings, he contends that the temporary custody decree continued with each continuance of the dissolution proceedings. The final dissolution decree entered in December 1986—in default judgment of Tamra—awarded Mr. Carver full custody. This decree, however, appears to have been procedurally defective: Tamra was not given adequate notice. Mr. Carver concedes

that this latter decree may have been flawed, but argues that the temporary decree was still valid at the time of the December 30 hearing. Because either the temporary or final decree was valid at that time, Mr. Carver asserts that, under the UCCJA and PKPA, the Washington court improperly modified them to award temporary custody to Tamra.

The Commissioner treated Ms. Carver's Washington dissolution action as a motion to modify the California decree. Mr. Carver argues that this might have been proper under the PKPA if California no longer had jurisdiction or declined to exercise jurisdiction to modify the initial decision. He asserts, however, that there is no evidence here that the California court lost jurisdiction—under 28 U.S.C. § 1738A(d)—therefore treatment of the dissolution petition as a motion to modify was an error. He claims that he never lost California as his domicile: even though he left the state at times, he never gave up his intent to maintain his domicile there.

He also points out that there had been no formal request to modify the order. He argues that a court cannot modify a decree sua sponte under the modification provisions of the UCCJA or the PKPA. For this point, he cites *In re Marriage of Corrie,* 32 Wn. App. 592, 596, 648 P.2d 501 (1982).

█ The resolution of this issue turns on whether or not the Superior Court Commissioner had the power to modify the California decree. Despite appellant's assertion to the contrary, nothing appears to prohibit a court from treating a dissolution proceeding as a modification. No provision of the PKPA or UCCJA proscribes this. The case to which appellant looks for authority does not, in fact, announce such a rule. In that case, the court simply found that the parties had not sought a modification, nor did the court enter one sua sponte. *Corrie,* at 596–97. The opinion, however, said nothing about a trial court's *power* to modify sua sponte.

Until modified, one state's decree is entitled to full faith and credit if it was made consistent with the provisions of the PKPA and UCCJA. 28 U.S.C. § 1738A(a); RCW 26.27-.130; U.S. Const. art. 4, § 1. Both the UCCJA and the PKPA provide for one state to modify the custody decree of another. Where conflicts arise between the two statutes, the PKPA preempts the other under the supremacy clause. *In re Thorensen,* 46 Wn. App. 493, 497, 730 P.2d 1380 (1987); U.S. Const. art. 6, cl. 2. Subsection (a) of the PKPA states:

> The appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided in subsection (f) of this section, any child custody determination made consistently with the provisions of this section by a court of another State.

28 U.S.C. § 1738A(a). Throughout its provisions, the PKPA mandates that determinations be made consistently with all of the provisions of the act. This is determinative in the present case.

Subsection (f) of the PKPA allows a state to modify another state's decree if:

> (1) it has jurisdiction to make such a child custody determination; and
> (2) the court of the other State no longer has jurisdiction, or it has declined to exercise such jurisdiction to modify such determination.

28 U.S.C. § 1738A(f).[4] The PKPA looks to the law of the state to determine jurisdiction. 28 U.S.C. § 1738A(c)(1). Jurisdiction in both Washington and California is determined by the UCCJA. *See* RCW 26.27; Cal. Civ. Code §§ 5150–74. Its jurisdictional provisions state:

---

[4]The UCCJA provides for a similar test in allowing one state to modify another's decree:

"(1) If a court of another state has made a custody decree, a court of this state shall not modify that decree unless (a) it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this chapter or has declined to assume jurisdiction to modify the decree and (b) the court of this state has jurisdiction." RCW 26.27.140.

(1) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination *by initial or modification decree if the conditions as set forth in any of the following paragraphs are met:*

(a) This state (i) is the home state of the child[5] at the time of commencement of the proceeding, or (ii) had been the child's home state within six months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state; or

(b) It is in the best interest of the child that a court of this state assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this state, and (ii) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships . . .

RCW 26.27.030; *see also* Cal. Civ. Code § 5152 (Deering Supp. 1989) (close to identical language).

 The Commissioner determined that the Washington courts had jurisdiction in the matter on the basis of both subsections (1)(a) and (b). Exhibit 2, at 111–12. Accordingly, he entered his decree of modification pending communication with the California court. The record, although conflicting, appears to support his finding: the Carvers moved back to Washington in mid–June (according to Ms. Carver) or early July (according to Mr. Carver). Report of Proceedings, at 75, 242. This would constitute 6 months' time in which Bethanie lived in Washington. In evaluating this evidence, one must defer to the fact finder: in this case, the Commissioner. *Cf. Jacobs v. Brock,* 73 Wn.2d 234, 437 P.2d 920 (1968) (trial court's determination of conflicting evidence conclusive). Further, the criteria in subsection (b) is equally if not more compelling: Bethanie

---

[5]"Home state" is defined by the UCCJA as: "the state in which the child immediately preceding the time involved lived with his parents, a parent, or a person acting as parent, for at least six consecutive months, and in the case of a child less than six months old the state in which the child lived from birth with *any* of the persons mentioned. Periods of temporary absence of any of the named persons are counted as part of the six–month or other period . . ." RCW 26.27-.020(5).

spent most of her life in Washington and many of her relatives live in this state. Report of Proceedings, at 85.

Under the same jurisdictional criteria—California also follows the UCCJA—it would appear that California lost jurisdiction over Bethanie. Because she had been living in Washington for 6 months, this state was now her home state, not California. The factors in RCW 26.27.030(1)(b), noted by the Commissioner, also point to greater contact with Washington than California. *See also* Cal. Civ. Code § 5152. The cooperation of California in assisting Washington in Mr. Carver's prosecution—the prosecution itself dependent on the validity of the Washington modification—and resolving habeas corpus proceedings in Ms. Carver's favor further attests to the former state's loss of jurisdiction. Therefore, under RCW 26.27.140(1), this state was free to modify the California decree.

Moreover, a more compelling reason exists for California's loss of jurisdiction. This reasoning follows the analysis of the analogous case of *In re Thorensen, supra.* As *Thorensen* stressed, the custody decrees issued by state courts must be consistent with the provisions of both the UCCJA and the PKPA. A central component of these acts is proper notice to the parties. 28 U.S.C. § 1738A(e); RCW 26.27.040. A decree made without proper notice, then, is not consistent with either act. The court in *Thorensen* held that continuing jurisdiction was linked to actions remaining consistent to the act. In particular, that court cited subsection (d) of the PKPA:

> The jurisdiction of a court of a State which has made a child custody determination *consistently with the provisions of this section continues* as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child or of any contestant.

(Italics ours.) 28 U.S.C. § 1738A(d). *Thorensen* held that since the court order at issue there was made without proper notice, jurisdiction did not continue. *Thorensen,* at

501. In other words, for a court to have continuing jurisdiction in the first place, it must make "a child custody determination consistently with the provisions of this section . . ." 28 U.S.C. § 1738A(d).

Appellant argues, however, that even if the dissolution decree of December 22 was invalid, he still had lawful custody of Bethanie under the temporary decree issued by the California court on March 24, 1986. The longevity of that decree, however, is in doubt.

 It appears that the California order of March 24, 1986, expired on April 21 because it was awarded "pending continuation date. above." On that latter date, the court did not specifically continue the custody order; it merely continued the proceedings until September 15, 1986. Exhibit 2, at 78. During this time, the Carvers were living together as one family and custody issues apparently would have been moot. Absent a court order to the contrary, both parents have equal rights to the custody of their child. *State v. LaCaze*, 95 Wn.2d 760, 763, 630 P.2d 436 (1981); *In re Schreifels*, 47 Wn.2d 409, 414, 287 P.2d 1001 (1955). The record indicates that, at the September 15 hearing, Mr. Carver requested the California proceedings to be put "off calendar." Exhibit 2, at 73. At that time, the family was living in Washington. Thus, in the absence of a clearer indication in the record, it appears that the March 24 order terminated by its own terms.

If the final decree was procedurally defective and the temporary decree had expired, then no valid order even existed which would have granted Mr. Carver sole custody of his daughter. Although the Snohomish County Superior Court Commissioner did not consider this in his analysis, it provides additional support for his ruling. A court order entered in violation of UCCJA and PKPA provisions need not be enforced in other states. *Thorensen*, at 501.[6]

---

[6]Because neither California decree was actually valid, Mr. Carver would have been guilty of custodial interference regardless of custody orders issued in Washington. Absent court orders to the contrary, *both* parents have a lawful right to

Mr. Carver also argues that the first proceedings filed take priority. He alleges that because his dissolution request in California was filed first, it takes priority over the proceedings filed in Washington by Tamra. The source he uses for this argument, however, states that only when the proceedings are simultaneous will the first action be given priority. *See* Donigan, *Child Custody Jurisdiction: New Legislation Reflects Public Policy Against Parental Abduction,* 19 Gonz. L. Rev. 1, 31 (1983–1984). Thus, his argument must assume that the initial California proceedings were still continuing when the Washington proceedings started. As mentioned above, the record indicates that Mr. Carver requested the California proceedings to be put "off calendar" on September 15, 1986. Exhibit 2, at 73. Thus, it is unclear whether the action should date back to January 1986, when the action was first filed. The final decree issued by the California court does appear to be simultaneous with the action filed by Tamra. That decree, however, was not in accord with the provisions of the UCCJA or PKPA. 28 U.S.C. § 1738A(e); RCW 26.27.040. Under both of those acts, then, the final decree was to be given no effect by Washington. This preempts his argument of priority.

The Commissioner in Snohomish County properly modified the California decree—that decree ultimately having no real effect. Tamra Carver, then, had lawful custody of Bethanie. When Peter Carver took Bethanie with him to California in January 1987, he deprived Tamra of lawful custody.

---

custody of their children. *State v. LaCaze, supra; In re Schreifels, supra.* Tamra, then, would have still had lawful custody, the deprivation of which is custodial interference.

## IV

The custodial interference statute is constitutional, both on its face and as applied to Mr. Carver. The record contains sufficient evidence to support the trial court's finding of guilt. The judgment of the trial court is affirmed.

CALLOW, C.J., and BRACHTENBACH, DOLLIVER, DORE, PEARSON, ANDERSEN, DURHAM, and SMITH, JJ., concur.

After modification, further reconsideration denied April 13, 1990.